IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NANCY SALCEDO,

        Plaintiff,

vs.                                            No. CIV 04-1268 JH/LFG

JO ANNE B. BARNHART,
Commissioner, Social Security Administration,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

      Plaintiff Nancy Salcedo ("Salcedo") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Salcedo was not eligible for supplemental security income benefits based on disability under 42 U.S.C. § 1381. Salcedo moves this Court [Doc. 15] for an order reversing the Commissioner's final decision and remanding for a rehearing.

### Background

      Salcedo was born on February 2, 1959 and was 44 years old at the time of the administrative hearing in this case. (Transcript at p. 51; hereinafter referred to in the format, "Tr. 51). She is married and lives with her husband. Salcedo has two children, who were ages 28 and 10 at the time

---

[1]**Within ten (10) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.**

of the hearing. (Tr. 47, 287). Salcedo has a ninth-grade education and did not earn a GED or take any further vocational training, except some computer training completed in January 2000. (Tr. 66, 280). Her past work history includes jobs as a cook/server in a school cafeteria, where she prepared food, served, and cleaned up; housekeeper for a church, where she cleaned offices, vacuumed and straightened up; and sales clerk in a flower shop, where she watered plants, cleaned, and served as a cashier. (Tr. 87-90, 280). She also worked as an assistant at a courthouse, and as a secretary at New Mexico State University. (Tr. 61). Her last job ended in December 1999 or December 2000 (the record is conflicting). (Tr. 87, 61).

Salcedo filed her application for SSI disability benefits on or about April 23, 2002. She alleged an onset date of December 17, 2000, and disability due to the following conditions: three fractured vertebrae, arthritis in her back, and high blood pressure. (Tr. 46, 50, 60). In her Disability Report, Salcedo stated that the disabling conditions first bothered her in January 1999 and that she stopped working on December 17, 2000. (Tr. 60). In her briefing, and elsewhere in the record, Salcedo alleges disabling conditions other than those listed in her initial application including headaches, pain in various parts of her body, fibromyalgia, and depression/anxiety.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests on the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the

---

[2]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

Commissioner at step five. If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1;[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the

---

[3] 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4] 20 C.F.R. §§ 404.1520(b), 416.920(b).

[5] 20 C.F.R. §§ 404.1520©), 416.920©).

[6] 20 C.F.R.§§ 404.1520(d), 416.920(d). If a claimant's impairment meets certain criteria, that means her impairments are "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. §§ 404.1525(a), 416.925(a).

[7] 20 C.F.R. §§ 404.1520(e), 416.920(e).

[8] The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. §§ 404.1567, 416.967.

[9] 20 C.F.R. §§ 404.1520(f), 416.920(f).

3

chance to prove she cannot, in fact, perform that work.[10]  In the case at bar, the ALJ made the dispositive determination of non-disability at step five of the sequential evaluation, finding that Salcedo is capable of performing a full range of light work.

The ALJ can meet the burden of proof at step five in two ways:  (1) by relying on testimony from a vocational expert to demonstrate that the plaintiff can perform other jobs in the economy; and/or (2) by relying on the grids set forth in Appendix 2.  Taylor v. Callahan, 969 F. Supp. 664, 669-70 (D. Kan. 1997).  Before applying the grids, the ALJ must first find the following:  "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity."  Id., at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).  Non-exertional limitations can include mental impairments. The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable.  However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work."  Id. (internal citations omitted).

In this case, the ALJ did not solicit testimony of a vocational expert to make the determination whether Salcedo could perform other work existing in significant numbers within the national economy; instead, the ALJ relied exclusively on the grids.  (Tr. at 20-21, 22, Finding No. 11).

Salcedo contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry her burden of proof, and that the Commissioner did not apply the correct legal standards.

---

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

## Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Services, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to consider whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects. [Citations omitted].

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence nor substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Salcedo claims the ALJ erred in failing to develop the record by not obtaining a consultative evaluation of Salcedo's mental functioning; in finding that Salcedo's headaches and depression are not severe impairments; and, by failing to acknowledge Salcedo's non-exertional impairments, and relying instead exclusively on the "grids" to determine that Salcedo is not disabled.

## Discussion

The Court finds that, in an otherwise thorough and well-considered opinion, the ALJ erred by failing to obtain a psychological consultation for Salcedo. The case will be remanded so that a psychological assessment can be done and the case reconsidered in light of the findings of the assessment. However, the Court rejects Plaintiff's claim that the ALJ erred at step two of the analysis in her finding that Salcedo's headaches do not constitute a severe impairment.

Failure to Order Consultative Examination

Salcedo's primary care physician is Dr. Eduardo J. Castrejon of Solano Medical Associates in Las Cruces. Salcedo submitted medical records detailing her visits with Dr. Castrejon from January 21, 1999 to July 5, 2003. (Tr. 166-168, 180-272). Beginning with the earliest visits on record, and continuing at almost every visit thereafter, Salcedo complained to Dr. Castrejon about body aches, back pain, and general weakness and tiredness. (Tr. 239). Although mental problems do not appear to be the primary reason for Salcedo's frequent visits to Dr. Castrejon, his notes also contain numerous references to Salcedo's problems with depression and anxiety.

On January 21, 1999, Dr. Castrejon noted that Salcedo was subject to crying spells and the "blues." He diagnosed her with depression. (Tr. 239). On April 20, 1999, he noted that she was suffering from anxiety and nervousness. (Tr. 237). On September 19, 1999, he noted crying and anxiety. (Tr. 234). On October 19, 1999, Dr. Castrejon's notes indicate that Salcedo cried often, and had the "blues" and feelings of uselessness. He also wrote "suicidal" in his treatment notes. Dr. Castrejon again made the assessment that Salcedo was suffering from depression, and he prescribed Paxil. He apparently considered giving her Prozac but changed his mind, as the word "Prozac" is written on the chart but then crossed out. A notation regarding "counseling" was made on that date,

but the record does not indicate any referral to a psychologist or psychiatrist (Tr. 232), and Salcedo stated at the hearing that she had not received any psychological counseling. (Tr. 283).

On November 16, 1999, Dr. Castrejon again noted anxiety and stress. (Tr. 230). On December 15, 1999, the medical record indicates Salcedo felt "sadness." (Tr. 229). On February 10, 2000, Dr. Castrejon wrote "sadness" and "blues." (Tr. 226). The May 2, 2000 medical record documents "sadness," "blues" and "crying spells." (Tr. 222). The same notation was made ten days later on May 31, 2000. (Tr. 221).

On July 25, 2000, the doctor wrote, "sadness," "blues" and "crying spells" on the chart, with an assessment of depression. (Tr. 218). It appears that Dr. Castrejon continued the prescription for Paxil throughout most or all of this period, either continuously or intermittently, from the time that medication first appears in the chart on October 19, 1999. On August 21, 2000, Dr. Castrejon noted again that Salcedo was suffering from sadness and the blues. He again assessed her with "depression," and he changed the antidepressive prescription to Zoloft. (Tr. 217).

The November 16, 2000 medical record contains a notation of "sadness" and "blues." (Tr. 213). On January 17, 2001, the notation "depression" is made, and Zoloft is continued. (Tr. 210). "Sadness, blues" is again noted on February 21, 2001. (Tr. 209). On March 22, 2001, a partially illegible notation is made regarding Paxil, and some reference is made to Zoloft or Prozac. (Tr. 208). The April 25, 2001 medical record indicates "anxiety" and insomnia. (Tr. 207).

At a visit on June 25, 2001, Dr. Castrejon noted that Paxil was to be continued. (Tr. 205). On July 31, 2001, he assessed Salcedo with "anxiety." (Tr. 203). On August 22, 2001, he made a notation under the heading "Psychiatric," but it is illegible. Dr. Castrejon's assessment on that date included a notation regarding depression, and the Paxil prescription was continued. (Tr. 202). On

September 25, 2001, his notation under "Psychiatric" appears to read "depression." (Tr. 201). "Malaise" was noted on January 31, 2002, although it is unclear whether this refers to physical or psychiatric symptoms. (Tr. 196).

Between March 5, 2002 and June 5, 2003, the record indicates that Salcedo was seen by Dr. Castrejon approximately 19 times. (Tr. 180-195, 166,168). For many of these visits, there is no indication at all why Salcedo came in to see the doctor. On other occasions, she complained of headaches or neck or back pain. No further psychiatric notations were made until the visit of June 5, 2003, when Dr. Castrejon again wrote "sadness" and "crying." In his assessment of that date, he made a notation of bipolar disease. (Tr. 166).

In May 2002, Dr. Castrejon referred Salcedo to Dr. Roderick A. Fields, a rheumatologist. The reason for the referral was Salcedo's continuing complaints of pain in the spine and other parts of the body. Most of Dr. Fields' report is focused on these symptoms. Dr. Fields also observed, however, that Salcedo suffered from anxiety, depression and sometimes fatigue. He further reported that she had been on Paxil, "on and off." (Tr. 130).

Salcedo was also seen by Dr. Jayed Iqbal on April 28, 2003 for a neurological consultation in connection with her complaints of headaches. Dr. Iqbal noted in his records that Salcedo reported suffering from claustrophobia, anxiety and difficulty sleeping. (Tr. 162).

The administrative record indicates that over a four and a half year period, Salcedo's primary care physician, and others, noted repeatedly and consistently that she suffered from sadness, the blues, crying spells, and anxiety. Her primary care physician diagnosed her with depression and possible bipolar disorder, and prescribed antianxiety and antidepressant medications, notably Paxil and Zoloft, in an effort to alleviate her suffering in this regard. There is no indication that these medications were

effective, as there is not a single notation stating that the depression had lifted or was no longer present. The medications continued to be prescribed over a multi-year period. Although one notation about "counseling" was made by Dr. Castrejon, he never referred Salcedo for psychological or psychiatric treatment.

Salcedo underwent a consultative examination by internist Dr. Andrew Maslona on July 8, 2002. Dr. Maslona noted that Salcedo had a history of anxiety without associated depression, suicidal ideation, or hospitalization for psychiatric reasons. (Tr. 138). It is unclear why Dr. Maslona would indicate that Salcedo did not suffer from depression, when her primary care physician had noted an assessment of depression on numerous occasions prior to her visit with Dr. Maslona, and had even written "suicidal" and "bipolar" in his treatment notes.

Salcedo did not list depression or anxiety on her initial application as a basis for seeking disability benefits; however, this does not preclude an award of benefits based on the unlisted impairments, especially mental impairments, if evidence of such impairments is submitted during the hearing. Hawkins v. Chater, 113 F.3d 1162, 1168-69 (10th Cir. 1997); Andrade v. Secretary of Health & Human Services, 985 F.2d 1045, 1049 (10th Cir. 1993). The Court finds that the medical records submitted to the ALJ, as discussed above, provide ample support to trigger further investigation. The ALJ evidently agreed, since, as discussed below, she told Salcedo that a consultative mental examination was necessary and that such an exam would be ordered. The problem is that this examination never took place, and the ALJ eventually made her decision without following up on the order for a mental assessment.

In addition to the medical records, Salcedo's own statements on the record support Dr. Castrejon's repeated assessments over the years that she suffers from psychological problems, and

9

further support her position that this impairment interferes with her daily functioning. Salcedo noted that she was suffering from "anxiety" while attempting to fill out the necessary forms in connection with her application for benefits. (Tr. 76). She stated in her Daily Activities Questionnaire, dated June 7, 2002, that on some days she cannot manage to get up and go anywhere and sometimes has to cancel appointments because she "cannot function mentally." (Tr. 77). In the same questionnaire, she also stated that she sometimes loses track of what she is doing while performing household chores (Tr. 78); gets anxious while doing shopping because of all the noise and people (Tr. 79); cannot concentrate on reading (Id.); sometimes has a hard time getting along with people and stops speaking to her friends because they "tend to get on my nerves" (Tr. 80); has trouble making decisions and suffers from depression, anxiety, panic attacks, fear, and other conditions (Tr. 82). She also stated that the thought of suicide has "crossed [her] mind." (Tr. 83).

Salcedo's brother confirmed that Salcedo told him that she sometimes gets apprehensive in large crowds, and that one of her primary problems is "stressing out." (Tr. 95, 96). In addition, Salcedo testified at the hearing that she experiences stress and anxiety waiting in line at the grocery store. (Tr. 290). In her January 13, 2003 statement in support of the request for an ALJ hearing, Salcedo noted that she cannot run errands or do shopping on her own, as she feels disoriented and anxious. (Tr. 106).

At the hearing, Salcedo told the ALJ that after leaving her last job, she stopped looking for work because of the stress and anxiety it caused her; she said, in fact, that the process of trying to find a new job made her feel "like I was cracking under pressure." (Tr. 281, 284-285). Salcedo also discussed the stress that her former job in the courthouse caused her, stating there were days that she

10

"wouldn't be able to make it through the day" (Tr. 283), apparently due to both physical and psychological symptoms.

At the hearing, the ALJ asked Salcedo if she were getting counseling. Salcedo responded that she was not in counseling but was taking medication. The ALJ then asked Salcedo, "Don't you think it's important to find out what's going on?" Salcedo answered that she was just going by what her doctor ordered, and he had never referred her for counseling. The ALJ then stated, "There's nothing in the record to support the fact that you have any psychological problems." (Tr. 283-284).

The Court assumes that the ALJ meant there was no diagnosis of psychological problems by a trained psychologist or psychiatrist, because the record is replete with Dr. Castrejon's numerous references to Salcedo's depression, one reference to suicidal thoughts, and one to bipolar disorder. The record also reflects that Dr. Castrejon prescribed antidepressant and antianxiety medications for Salcedo for much of the four to five-year period represented by the medical records.

The ALJ stated to Salcedo that Dr. Castrejon is not a psychologist, "so he's not qualified to diagnose or treat whatever is causing that, those kind (sic) of problems for you." (Tr. 284). The ALJ then said:

> So here is what I'm going to suggest. That because your doctor has not referred you to a psychologist or to a psychiatrist for testing and diagnosis to see what is going on in that area, I'm going to refer you to one. We pay for it. And I'm going to have – ask that they do a complete evaluation and testing to see what is going on.

(Tr. 285).

Later in the hearing, the ALJ reiterated the importance of having a psychological evaluation:

> Q (ALJ): Okay. Well, let's see what the psychologist has to say about some of this stuff, your anxiety. You told one of the doctors you feel claustrophobic. Let's see what's going on. They will have

11

> you participate in a series of tests and do your best. You'll probably be there a good part of the day. And they'll know if you're not trying. Their tests are set up to know that you're just not getting it. You're off. Okay. And you'll be able to take breaks and sit and stand if you want. But do your best and we'll complete all the tests.
>
> A (Salcedo): Okay.
>
> Q (ALJ): It shouldn't be that difficult for you, but it is important. And surprisingly enough, they're really able to tell a lot and they'll explain all that to you. Okay?
>
> A (Salcedo): Okay.
>
> Q (ALJ): So you'll get a notice of an appointment and make sure you make it.
>
> A (Salcedo): Okay.

(Tr. 292). Later, the ALJ told Salcedo that the results of the mental examination might require a supplemental hearing, in which event, the ALJ said, Salcedo may want to retain an attorney to represent her. (Tr. 296). The hearing concluded with the ALJ informing Salcedo, "you're going to be getting a notice. Make sure you make your appointment and then I'll be receiving the report from the doctor whenever." (Tr. 297).

These statements were made to Salcedo at the hearing on June 12, 2003. For reasons not apparent from the record, the ALJ waited over two months, until August 21, 2003, to order a psychological evaluation for Salcedo. (Tr. 8-12). And for reasons again unexplained on the record, the evaluation was never done.

Instead, when the ALJ filed her decision on May 25, 2004, nearly one year after the hearing, she made no mention at all of her August 2003 order for a consultative psychological evaluation. The Court finds this quite puzzling, as the ALJ is the one who suggested that the examination be done,

after stating at the hearing that a proper assessment of Salcedo's mental impairment was "important" and would require evaluation by a trained psychologist. (Tr. 284).

In her decision, the ALJ referred only briefly to Salcedo's depression and anxiety without noting that a consultative examination had been ordered:

> While there is mention of headaches, anxiety and depression, there is no evidence that these conditions have caused more than a minimal effect on the claimant's ability to perform basic work-related activities, and thus do not constitute severe impairments. She was taking Paxil but reported on May 9, 2002 that she had been off the medication for two months. Furthermore, she has not undergone any counseling for her mental condition.

(Tr. 18). The ALJ then found that Salcedo had no non-exertional limitations, and she made the finding of nondisability on the basis of the grids. (Tr. 21-22).

In a letter which is undated but which appears to be a response to the ALJ's opinion, Salcedo expressed surprise that the decision was reached without the mental examination which the ALJ said would be scheduled: "[The ALJ] said she was going to send me an appointment that was like an all-day evaluation. I never did receive an appointment from her. All I got was this letter of denial." (Tr. 29). In light of the ALJ's earlier statements, Salcedo's confusion is understandable.

An ALJ has an obligation to ensure that an adequate record is developed. Henrie v. United States Dept. of Health & Human Services, 13 F.3d 359, 360 (10th Cir. 1993). This duty is especially urgent when the claimant, as was the case with Salcedo, has limited education and is not represented by counsel. Id., at 360-61; Dixon v. Heckler, 811 F.2d 506 (10th Cir. 1987).

It is true that the Commissioner has broad latitude in deciding whether or not to order a consultative examination. Diaz v. Sec'y of Health & Human Services, 898 F.2d 774, 778 (10th Cir. 1990). However, the duty to order an examination is triggered when the plaintiff satisfies her burden

13

of providing objective evidence "sufficient to suggest a reasonable possibility that a severe impairment exists." Hawkins v. Chater, *supra*, at 1167. In deciding how much evidence is sufficient to raise the issue, "the starting place must be the presence of some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." Id.

The evidence as outlined above supports Salcedo's position that the ALJ erred in failing to order a mental status examination. The results of such an examination would be crucial in determining whether Salcedo's mental impairment is "severe," and the ALJ would be in a better position to determine the severity or non-severity of the impairment with a consultative examination. In addition, the examination results would be of assistance to the ALJ in deciding whether Salcedo suffered from a nonexertional mental impairments such as depression or anxiety, in which case it might not be appropriate to rely exclusively on the grids in making the final disability determination.

This case must be remanded so that the consultative mental examination can be conducted and reconsideration made in light of the findings of that examination.

### Step Two Finding that Headaches are Nonsevere

Salcedo also argues that the ALJ erred in finding at step two that her headaches are not a "severe" impairment. She contends that the ALJ should have taken the headaches into account as a severe nonexertional impairment precluding resort to the grids.

At step two of the sequential evaluation process, the ALJ decides whether the claimant has a medically severe impairment or combination of impairments. Williams v. Bowen, *supra*, at 750. Plaintiff bears the burden of presenting medical evidence of a severe impairment. Id., at 751. "A severe impairment is one that interferes with basic work activities," Roberts v. Callahan, 971 F. Supp.

14

498, 500 (D.N.M. 1997). Conversely, an impairment is not severe "if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," including walking, standing, sitting, lifting, hearing, seeing, speaking, understanding, carrying out simple instructions, use of judgment, responding appropriately to supervision and co-workers, and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(1-6). An impairment is not severe if it is only a slight abnormality with a minimal effect on the ability to do work. Roberts v. Callahan, *supra*, at 500 (*citing* SSR 85-28).

> Presumptively, if the medical severity of a claimant's impairments is so slight that the impairments could not interfere with or have a serious impact on the claimant's ability to do basic work activities, irrespective of vocational factors, the impairments do not prevent the claimant from engaging in substantial gainful activity. If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, on the other hand, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three.

Williams v. Bowen, *supra*, at 751 (*citing* Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987).

The Court recognizes that the step two showing is meant to be *de minimis*. However, the Court concludes that substantial evidence supports the ALJ's determination in this case that Salcedo failed to make even this *de minimis* showing. Plaintiff's burden is to demonstrate that her headaches significantly limit her mental or physical ability to engage in the type of basic work activities described at 20 C.F.R. § 404.1521(b)(1-6). The record does not indicate such significant limitations due to headaches.

15

The ALJ determined that, while the record shows "mention of headaches," there was no evidence that the headaches caused more than a minimal effect on the claimant's ability to perform basic work-related activities. To support this determination, the ALJ noted that Salcedo stated in May 2003 that her headaches were better. The ALJ also pointed to the result of an MRI scan of Salcedo's head and brain, which was essentially normal in all particulars. (Tr. 18).

Plaintiff notes that Salcedo complained to her primary care physician on numerous occasions that she was suffering from headaches. The medical records support this assertion. However, it is also accurate, as the ALJ pointed out, that Salcedo underwent an MRI of the brain on October 8, 1999, and it showed nothing to account for her reportedly constant headaches. (Tr. 18, 135). In addition, Salcedo has not shown that the headaches interfered with her ability to work.

In 2003, Dr. Castrejon referred Salcedo for a consultation with Dr. Jayed Iqbal, a neurologist. Salcedo first visited Dr. Iqbal on April 28, 2003. The reason given for the visit was Salcedo's "persistent, constant headaches." (Tr. 162). Salcedo reported to Dr. Iqbal that, for the preceding two months, she had been having daily throbbing headaches which lasted all day. (Tr. 162, 164). However, she also said that she had started taking Aleve, an over-the-counter remedy, a few days before, for sinus and allergies, and her headaches were "somewhat better," apparently as a result of the medication. (Tr. 162).

Salcedo told Dr. Iqbal at this visit that she thought her neck and scapular area pain triggered the headaches. He ordered an MRI of her cervical spine. The MRI report showed that vertebral body height had been preserved and there was some straightening of the cervical spine and some disc dessication, especially at the C 4-5 and C 5-6 levels. The report also noted degenerative changes and osteophyte (bony outgrowth) formation at those levels as well, causing thecal sac indentation, but

16

with no significant narrowing of the canal and no compression of the spinal cord. (Tr. 159, 161).

At her second visit with Dr. Iqbal on May 27, 2003, Salcedo again reported that her headaches were better. Dr. Iqbal noted at this visit that Salcedo showed no muscular weakness and that her gait, station and coordination were all normal. He concluded that Salcedo was not a candidate for surgery at that time. He prescribed pain medication and referred her for physical therapy. (Tr. 160, 111).

Plaintiff argues that the record indicates there were numerous occasions when Salcedo sought medical attention for head and neck pain. The instances on which she complained of headache, however, were fewer than those cited in Plaintiff's brief. In addition, the ALJ did find that Salcedo's cervical neck pain was a severe impairment, thus indicating that the ALJ carefully reviewed the record and distinguished between severe impairments, such as neck pain, and those, such as the headaches, which do not appear to have interfered with Salcedo's basic ability to do normal work tasks. (Tr. 17). Although Salcedo stated to Dr. Iqbal that her neck and scapular pain might be triggering the headaches, neither he nor any other medical doctor made that finding.

Salcedo stated at the hearing that she had headaches which interfered with her sleep. (Tr. 291-92). However, this does not establish, and the record does not support, her contention that headaches have interfered with her ability to perform basic work functions. In her Daily Activities Questionnaire, Salcedo stated that she goes shopping, along with her husband, once a week. She drives herself to medical appointments. She prepares two meals a day and does laundry and household chores, although no yard work or vacuuming. She can generally take care of her own grooming, although she says that sometimes she cannot lift her arms up to shampoo or comb her hair;

17

a problem which does not appear to be related to headaches. She states that she can type and use a keyboard. (Tr. 77-86).

This record does not demonstrate that Salcedo's headaches interfere with her abilities to walk, stand, sit, lift, hear, see, speak, understand, carry out simple instructions, use judgment, respond appropriately to supervision and co-workers, or deal with changes in a routine work setting. The Court finds that the ALJ reasonably determined that Salcedo's headaches do not constitute a severe impairment. Upon remand, no further findings need be made on this issue.

### **Recommended Disposition**

That Plaintiff's Motion to Reverse and Remand for a Rehearing [Doc. 15] be granted, and that this matter be remanded to the Commissioner with directions that a consultative mental examination be performed and the decision be reconsidered in light of the findings of that examination.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge